1
2
3      UNITED STATES DISTRICT COURT
4      DISTRICT OF NEVADA
5      * * *
6    ELIZABETH BAKER,                          Case No. 3:17-cv-00587-MMD-CBC
7                           Plaintiff,                    ORDER
         v.
8
     APTTUS CORPORATION, a Delaware
9    Corporation; DOES I-X, inclusive,
10                         Defendants.
11

12   **I.     SUMMARY**

13          This case concerns the hiring, brief employment, and ultimate termination of

14   Plaintiff Elizabeth Baker by Defendant Apttus Corporation ("Apttus"). Chiefly before the

15   Court are Baker's motion for summary judgment on Apttus' counterclaim ("Baker's MSJ")

16   (ECF No. 121) and Apttus' motion for summary judgment on all of Baker's claims ("Apttus'

17   MSJ") (ECF No. 122). The Court will grant Baker's MSJ. The Court will also grant Apttus'

18   MSJ in part and deny it in part.[1]

19   **II.    BACKGROUND**

20          The following facts are undisputed unless otherwise noted.

21          **A.     The Parties**

22          Baker is a high-level corporate executive with an extensive background and

23   experience in strategic development and sales in and with large and complex global

24   organizations. (ECF No. 35 at 2.) She has worked at multiple large companies in addition

25   to small startup companies. (*E.g.*, ECF No. 122-3 at 5.)

26   ///

27          [1]In addition to the motions, the Court has also considered the submitted response
     (ECF No. 123) and reply (ECF No. 134). No response and reply were filed concerning
28   Baker's MSJ.

1   Apttus was founded in 2006 and is a "Quote-to-Cash" software provider, which

2   generally handles revenue operations between companies and their customers. (ECF No.

3   122-2 at 4; ECF No. 36 at 2.) Apttus was most recently acquired for over 1.5 billion dollars

4   in 2018. (ECF No. 122-1 at 7.)

5   **B.   Relevant Facts[2]**

6   Baker's mentor and former boss George Kadifa introduced her to Apttus' cofounder

7   and CEO, Kirk Krappe, in August 2015. (ECF No. 123-1 at 81; ECF No. 122-3 at 15–16.)

8   Baker had recently resigned from her position with her previous employer—SAP—and

9   was "think[ing] about her next ten years." (ECF No. 122-3 at 8.) Among other things, Kadifa

10   told Baker that Apttus was "on a rocket ship," had "high growth," and "need[ed] help

11   bringing in seasoned salespeople" as they tried "to go into the enterprise space." (*Id.* at

12   16.)

13   After leaving SAP, Baker fielded verbal job offers from Infinstra, Cisco, Infosys, and

14   Vista Partners, among others. (ECF No. 122-3 at 7–10.) Baker took a meeting with Apttus

15   management in September 2015. (ECF No. 35 at 4–5.) Baker entered into negotiations

16   with Apttus to form an at-will employment agreement. From October 2015 through January

17   ///

18   _____

19   [2]In its reply, Apttus challenges Baker's Exhibits 11, 20, 21, 22, 23, 24, 25, and 31 as unauthenticated. (ECF No. 134 at 2–3.) Baker has moved for leave of court to file a surreply, accompanied by the surreply, to address the issues. (ECF No. 136.) Apttus has

20   not responded. The Court will therefore grant the motion for leave as unopposed under Local Rule 7-2(d).

21   In her surreply, Baker contends Apttus does not properly challenge the authenticity

22   of the exhibits. (*Id.* at 8.) She otherwise states that Exhibit 11 is authentic as it was physically handed to her by an Apttus representative while she worked for Apttus and its

23   authenticity may be inferred under Fed. R. Evid. 901. (*Id.* at 9–10, 13.) Baker contends that the authenticity of Exhibits 20, 21, 25 may be inferred under Fed. R. Evid. 901(b)(4),

24   and these exhibits would be admissible at trial, and were already authenticated by Apttus executives at deposition. (*Id.* at 10–11, 13.) Finally, Baker provides that Exhibits 22, 23,

25   24 and 31 are already authenticated because Apttus produced them during discovery (*id.* at 10–13). *See, e.g.*, *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d at 781

26   (deeming documents authentic because the plaintiff had identified the documents as being produced by the parties in discovery). The Court finds that the authenticity of the

27   documents has not been meaningfully challenged, and the documents meet the requirements of authenticity under *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776 (9th

28   Cir. 2002).

1  2016, Baker communicated with Krappe and Apttus' Vice President of Global Human

2  Resources, Judy Madden ("Madden"). (ECF No. 122-1 at 90–94, 96–102.)[3]

3        Ultimately, Baker and Apttus reached a final agreement, executed on January 11,

4  2016 (the "Agreement"). (ECF No. 122-1 at 105–08.) The Agreement provided that Baker

5  would accept employment with Apttus in the position of General Manager, Global Sales

6  Strategy, and would report directly to Krappe. (*Id.* at 105.) However, by Baker's hiring

7  Kamal Ahluwalia ("Kamal") was made the head of sales, giving him the final word on

8  Baker's sales accounts and support resources. (ECF No. 123-1 at 4.)

9        The Agreement also expressly provided for Baker's employment to be at-will:

10      **2. At-Will Employment.** Your employment at Apttus is at-will. As an at-will
employee, either you or Apttus may terminate your employment at any time,

11  for any reason, with or without cause, and with or without notice. In the event
of your resignation, we request that you give Apttus at least two (2) weeks

12  notice. Please note that Apttus may change your job duties, title,
compensation and benefits, as well as Apttus' personnel policies and

13  procedures, from time to time.

14  (*Id.* at 107.) The Agreement further specified that it "supersede[s] any prior representations

15  or agreements including, but not limited to, interview or pre-employment negotiations,

16  whether written or oral." (*Id.* at 108.) In the event of termination (separately and including

17  termination following the consummation of a Change in Control), the Agreement provided

18  for severance benefits upon a timely execution and non-revocation of a "release of claims

19  in a form reasonably satisfactory to the Company." (*Id.* at 107.)

20        In terms of her employment, Baker was specifically tasked with building a global

21  sales team to secure large enterprise accounts for Apttus. (ECF No. 122-1 at 105; ECF

22  No. 122-3 at 21; ECF No. 35 at 3, 12.) However, soon after Baker was hired, infighting

23  began between her and other employees, particularly former Senior Vice President of

24  Sales Excellence, Jeffrey Santileces ("Santileces"), and former Chief Revenue Officer,

25  Kamal. (*E.g.*, ECF No. 122-4 at 4–6 (deposition of Apttus former Vice President of Sales

26  ///

27      [3]Some of the emails appear to be between Apttus and Greg Lyon. However, Baker
testified that Lyon was her husband at the time and she was communicating through him

28  or his account. (*See* ECF No. 122-3 at 48.)

1  Operations, Ankur Ahlowalia); ECF No. 123-1 at 3–5).) Kamal apparently had the

2  understanding that Baker was hired to bring in new accounts. (ECF No. 122-5 at 7, 10–14

3  (deposition of Kamal).) However, Baker contended that, according to what Krappe told

4  her, her sales team was entitled to take any existing accounts it desired that had previously

5  been assigned to Kamal's team. (ECF No. 122-3 at 32–33.)

6      The sales teams argued extensively over which accounts should be assigned to

7  each team. (ECF No. 122-4 at 4–6; ECF No. 122-5 at 16; ECF No. 123-1 at 109–11, 113,

8  121–22; ECF No. 123-1 at 121–22; ECF No. 123-1 at 115.) They appealed to Krappe to

9  have him decide which accounts should be assigned to each team. (*See, e.g.*, ECF No.

10  122-1 at 111–13 (emails between Baker and Kirk Krappe); ECF No. 123-1 at 113 (emails

11  between Santileces and Krappe with Kamal cc'd); ECF No. 123-1 at 111 (Santileces

12  providing that he would turn to Krappe for guidance).)[4]

13      Baker's sales assignments included accounts that Apttus had lost or that did not

14  present viable sales opportunities. (*E.g.*, ECF No. 123-1 at 104 (February 19, 2016 email

15  from Santileces to Kamal, stating that the IBM account has been lost and decides they

16  should "force [IBM] into one of [Baker's] 35 accounts"); ECF No. 123-1 at 115 (March 2,

17  2016 email from Santileces saying "[Baker does not know this, but Kirk [Krappe] wants me

18  to offer up the 17 SAP accounts. I will do so. They are low propensity to buy because of

19  SAP and no/limited SFDC footprints").)

20      Krappe and other executives refused to assign 10 accounts to each of Baker's

21  managers, even though, according to Baker, Krappe had previously agreed to give

22  Baker's team that amount.[5] (*Compare* ECF No. 128 at 15–16 (Baker's March 30, 2016

23  email regarding not having received "the initial 10 accounts per rep"); ECF No. 123-1 at

24  3–4 (Baker's declaration at paragraph 10) *with* ECF No. 123-1 at 104 (Krappe expressing

25  ///

---

26  [4]According to Baker, Krappe always made decisions that favored Kamal and Santileces. (ECF No. 123-1 at 5.)

27
28  [5]Baker alleges that Kamal also made representations regarding territory allocation and 10 accounts per member of Baker's sales team (ECF No. 35 at 28).

1    that the goal for Baker was to take new accounts not take current opportunities); *see also*

2    ECF No. 128 at 15 (March 30 email from Santileces to Krappe and Kamal, stating that he

3    had "zero interest in trading anything with [Baker]" and asserting that Baker had "totally

4    F'd up HPE [(Hewlett Packard Enterprise)] . . . She almost did the same with IBM.

5    Thankfully, you got us back in the game at IBM").)

6        By June 2016, Apttus decided that Baker was not worth the cost and expressed

7    concerns about her engagement with customers. (*E.g.*, ECF No. 128 at 24 (noting in

8    February 2016 that there was non-favorable feedback about Baker with reference to IBM);

9    *id.* at 15 (as noted *supra*, Santileces' March 30, 2016 statements regarding Baker dealing

10   with HPE and IBM); *id.* at 6 (showing June 14 email exchanges between Krappe and Baker

11   that were forward to Madden, stating: "[W]e need to get rid of [Baker]. She is a massive

12   liability and does not fit at Apttus"); *id.* at 8 (appearing to express concern about Baker's

13   handling of several accounts—HPE, IBM, Jeppeson, Clorox, Adecco, and BMW).).

14        Apttus terminated Baker's employment, effective June 15, 2016—roughly six

15   months after she was hired. (ECF No. 122-3 at 53.) Baker's termination occurred during a

16   telephone conference call while she was in Europe ("Termination Call"). (*Id.*; ECF No. 121

17   at 12–13, 19).[6] A third-party who was with Baker at the time recorded the Termination

18   Call. (ECF No. 121 at 13.)

19        After terminating Baker, Apttus presented her with a document titled "Separation

20   Agreement and Release of Claims." (ECF No. 123-1 at 64–73.) It included waivers and

21   surrenders of legal rights, confidentiality provisions, a noncooperation clause, a

22   noncompete clause, and an agreement to arbitrate. (*See id.*)

23   ///

24   ///

---

25       [6]The Court will use Europe broadly because the record suggests that Baker was
either in Belgium or Denmark. (*Compare* ECF No. 121 at 9 (Baker's declaration providing

26   Denmark) *with id.* at 12 (Baker stating she was in Belgium during her deposition) & *id.* at
19 (errata sheet from Baker indicating that Baker's recollection of being in Belgium was

27   an incorrect recollection and that she was instead in Copenhagen, Denmark).) This does
not mean the Court does not accept Baker's ultimate representation that she was in

28   Denmark. The precise location in Europe is simply immaterial.

1

2
### C.    Claims and Counterclaim

3
In her First Amended Complaint ("FAC") (ECF No. 35),[7] Baker asserts five claims

against Apttus: (1) fraud/misrepresentation (claim one); (2) intentional interference with

4
prospective economic advantage (claim two); (3) wrongful termination (claim three); (4)

5
breach of contract (claim four); and (5) breach of duty of good faith and fair dealing. (*Id.* at

6
20–35.) Apttus answered the FAC and asserted a counterclaim against Baker for

7
recording the Termination Call, claiming a violation of NRS § 200. 690. (ECF No. 36.)

8
## III.    LEGAL STANDARD

9
"The purpose of summary judgment is to avoid unnecessary trials when there is no

10
dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

11
F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings,

12
the discovery and disclosure materials on file, and any affidavits "show that there is no

13
genuine issue as to any material fact and that the moving party is entitled to a judgment

14
as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is

15
"genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could

16
find for the nonmoving party and a dispute is "material" if it could affect the outcome of the

17
suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

18
The moving party bears the burden of showing that there are no genuine issues of

19
material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the

20
moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the

21
motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*,

22
477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must

23
produce specific evidence, through affidavits or admissible discovery material, to show

24
that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991),

25
and "must do more than simply show that there is some metaphysical doubt as to the

26
material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting

27
///

28
[7]ECF No. 34 appears to be the same document as ECF No. 35. The Court refers to the later filed document.

1
2
3
4
5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. Moreover, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

6

## IV.    BAKER'S MSJ (ECF NO. 121)

7
8
9
10
11
12

In its counterclaim, Apttus seeks damages pursuant to NRS § 200.690 from Baker for intercepting and recording the Termination Call. (ECF No. 36 at 16–17.) Baker argues that Apttus is not entitled to damages under § 200.690 because she was in Europe—not Nevada—at the time and also that she did not possess the requisite mental state to violate § 200.620. (ECF No. 121 at 3–5.)  Apttus has not responded to Baker's MSJ. In any event, the Court agrees with Baker that Apttus is not entitled to damages

13
14
15
16
17
18
19
20
21

NRS § 200.690(1)(b) provides a private right of action against "[a] person who willfully and knowingly violates NRS [§] 200.620." *Ditech Fin. LLC v. Buckles ("Ditech")*, 401 P.3d 215, 216 (Nev. 2017); *see also* NRS § 200.690(1)(b)(1) – (3). NRS § 200.620(1) states that "it is unlawful for any person to intercept or attempt to intercept any wire communication . . .." In *Ditech*, the Nevada Supreme Court considered the statute and held that "NRS [§] 200.620 does not apply when the act of interception takes place outside Nevada." 401 P.3d at 217. It is undisputed that the interception here took place outside of Nevada. Accordingly, the Court finds in favor of Baker and will grant her summary judgment on the counterclaim.

22

## V.    APTTUS' MSJ (ECF NO. 122)

23
24
25
26

The Court considers each of Baker's claims in sequential order, except the Court considers her first claim for fraud/misrepresentation last. The parties' arguments chiefly focus on the latter (ECF No. 122 at 11–23; ECF No. 123 at 13–21) and the Court ultimately finds that it is the only claim to survive summary judgment.

27

///

28

///

1
2

**A.      Intentional Interference with Prospective Economic Advantage (Claim Two)**

3      To prevail on a claim of intentional interference with prospective economic

4  advantage, Baker must prove: (1) a prospective contractual relationship between Baker

5  and a third party; (2) Apttus knew about the relationship; (3) Apttus intended to harm Baker

6  by preventing the relationship; (4) the absence of privilege or justification by Apttus; and

7  (5) Baker suffered actual harm as a result of Apttus' actions. *See Wichinsky v. Mosa*, 847

8  P.2d 727, 729–30 (Nev. 1993) (citation omitted).

9      Baker claims that Apttus intentionally interfered with her prospective job

10  opportunities by inducing her to "cease pursuing other [job] opportunities in favor of joining

11  Apttus." (ECF No. 35 at 30–31; *see also* ECF No. 123 at 21; ECF No. 123-1 at 3.) Apttus

12  contends that Baker cannot establish, *inter alia*, the first three elements of the claim. (ECF

13  No. 122 at 23–24.) The Court agrees that the claim plainly fails. Baker has produced no

14  evidence to support a conclusion that Apttus intended to harm Baker by preventing a

15  prospective employment relationship. Baker does not insomuch as pinpoint a third party

16  with whom there was a concrete prospective contractual relationship that Apttus interfered

17  with. (*See, e.g.*, ECF No. 123-1 at 3 (stating only "*I gave up othe*r valid, genuine job offers

18  and quit pursuing other opportunities to work for Apttus . . ."); ECF No. 122-3 at 7–9 (Baker

19  explaining that she had no *written* offers of employment after she left SAP and before

20  being hired by Apttus).) The Court therefore finds that Apttus is entitled to summary

21  judgment in its favor. *See id.* at 730 ("Absent proof of each element of the tort of intentional

22  interference with prospective economic advantage, the claim must fail.").

23      **B.      Wrongful Termination (Claim Three)**

24      Under Nevada law, an employer can terminate an at-will employee whenever and

25  for whatever reason without liability for wrongful termination, unless both parties had an

26  express or implied contract that the employer can discharge the employee only for cause.

27  *See Hirschhorn v. Sizzler Restaurants Int'l, Inc.*, 913 F. Supp. 1393, 1399–400 (D. Nev.

28  1995) (citations omitted); *Yeager v. Harrah's Club, Inc.*, 897 P.2d 1093, 1095 (1995)

1    (noting in dicta that employment is at-will if it "is not for a definite period and if there are

2    no contractual or statutory restrictions on the right of discharge" (citation omitted)).

3    Nonetheless, Nevada law provides that "[a] tortious discharge may arise . . . when

4    . . . the employer terminates an employee for reasons which violate public policy or the

5    discharge is in retaliation for the employee's actions that 'are consistent with or supportive

6    of sound public policy and the common good.'" *Jackson v. Universal Health Servs., Inc.*,

7    No. 2:13-cv-01666-GMN-NJK, 2014 WL 4635873, at *4 (D. Nev. Sept. 15, 2014) (quoting

8    *D'Angelo v. Gardner*, 819 F.3d 206, 216 (Nev. 1991)). "Discharging an employee for

9    seeking industrial insurance benefits, for performing jury duty or for refusing to violate the

10   law are examples of tortious discharge." *D'Angelo*, 819 F.3d at 712. However, "public

11   policy tortious discharge actions are severely limited to those rare and exceptional cases

12   where the employer's conduct violates strong and compelling public policy." *Sands Regent*

13   *v. Valgardson*, 777 P.2d 898, 900 (1989).

14   Here, Baker alleges that she was wrongfully terminated by tortious conduct in

15   violation of Nevada public policy against lying and forcing employees to commit fraud.

16   (ECF No. 35 at 31–33; ECF No. 123 at 21–22.) Baker specifically claims that at the least

17   she has provided sufficient evidence to create a genuine issue of fact whether she was

18   fired for refusing to lie to customers. (*Id.*) In support of this position, Baker points to her

19   declaration (ECF No. 123-2 at 1–8) and two other pieces of evidence. (ECF No. 123 at

20   21–22.*)* The first of the latter pieces of evidence is an affidavit by Marco De La Cuesta,

21   who was part of the sales team Baker managed. (ECF No. 123-1 at 74–75.) The second

22   piece of evidence is a June 24, 2016 email chain exchange between Baker and Krappe

23   that was ultimately forwarded to Madden, constituting Baker's Exhibit 12 (ECF No. 127-1

24   at 3–5).[8]

25   ///

26   ///

27   _____

28   [8]The Court denied the parties' stipulation (ECF No. 124) to file Exhibit 12, among others—Exhibits 15, 16, 17, 26, 27, and 29—under seal. (ECF No. 126; *see also* ECF Nos. 127, 128.)

9

1    In De La Cuesta's affidavit, he states, "Our team was directed to make false

2    representations to 3M, Clorox, Intel, and GE concerning the status and progress of the

3    development of Apttus products and that we were trying to sell to 3M, Clorox, Intel, and

4    GE." (ECF No. 123-1 at 75.)  He further attested that he and Baker "adamantly refused to

5    engage in making false representations to our customers and prospective customers and

6    we made our position known to Apttus management and executives." (*Id.*) De La Cuesta's

7    affidavit makes no connection between he and Baker's refusal of misrepresentation and

8    Baker's termination by Apttus. (*See id.*)

9    In her declaration, Baker recalls an exchange between her and Krappe as support

10   for her contention that Apttus executives did not want her and her sales managers to be

11   honest and transparent with customers, such as HPE. (ECF No. 123-1 at 4–5.) In this

12   regard Baker notes:

13   > I truthfully answered HPE's question by stating that the timeframe for
     > implementation was seven months. After so stating, Krappe informed me
14   > that I should not have told HPE that it would take seven months, but instead,
     > should have told them three months. I asked Krappe if he expected me to
15   > lie, and he responded that I should not disclose *everything*.

16   (*Id.* at 5.) Baker states that she reiterated this exchange in the June 24, 2016 email

17   exchange and was terminated 3 days later. (*Id.*) Relevantly, in that email exchange Baker

18   told Krappe: "HPE, yes, I understand now that Apttus does not want me to take the Product

19   Management view on effort and that we should go to Neehar. My mistake was the

20   procurement management stated 7 months for the Pilot and Apttus did not want me to

21   state this." (ECF No. 127-1 at 5.)

22   Apttus counters, arguing that Baker presents neither evidence that she was asked

23   to violate the law nor evidence that she was terminated in retaliation for refusing to violate

24   the law. (ECF No. 134 at 14–17.) As to the latter, Apttus contends, among other things,

25   that the June 24 email read in its entirety is not sufficient evidence tending to support that

26   Baker was terminated for refusing to mislead customers. (*Id.* at 16–17.)

27   ///

28   ///

10

1    The Court finds that the inference Baker essentially asks the Court to draw, from

2    the parts of the June 24 email she relies on, to conclude that Baker was terminated for

3    refusing to lie to customers is too tenuous to support that conclusion.

4    Baker's Exhibit 12 largely captures: Baker extensively complaining to Krappe about

5    Kamal—including that the latter was using his leverage to prevent individuals like her from

6    succeeding, and whose control of certain resources made it difficult to do what was best

7    for Apttus; detailing certain "structural and infrastructure issues within Apttus"; noting

8    Apttus' failure to engage with customers and the negative feedback from customers and

9    Apttus' negative branding; and, expressing concern that Apttus was "not looking to win[,]"

10   among other things. (ECF No. 127-1 at 3–5.) The email chain shows that Krappe

11   responded to Baker, stating:

12
> I am a big supporter of yours but I must admit this email sincerely disturbs
13
> me. It is so far off track that I don't even know how to respond. Your fingter
> [sic] pointing, assertions on Kamal, assertions about Apttus historically,
> former employees etc is so far off mark that I am speechless.
14

15
> Lets [sic] talk tomorrow to sort this out.

16   (*Id.* at 3.) Krappe also emailed Baker that night writing, *inter alia*, that he "[h]eard a

17   disturbing story about our engagement or lack thereof at Adecco – we should talk about

18   this – I have personal connections there" (*id.* at 5). Later the same night, Krappe forwarded

19   the email chain to Madden and another individual. (*Id.* at 3.) Krappe specifically asked for

20   Madden's point of view and stated: "we need to get rid of her. She is a massive liability

21   and does not fit at Apttus. She is lying and missing the point completely." (*Id.*)

22   This evidence supports Apttus' proffered reason for terminating Baker's

23   employment.  It simply does not support the conclusion that Baker was terminated for any

24   of the reasons she relies on to support her claim—whether concerning public policy

25   violations, in retaliation for Baker's support of public policy, or otherwise.  Said differently,

26   based on this evidence, the Court cannot conclude that Baker presents any more than a

27   scintilla of evidence in support of her claim that she was terminated for refusing to violate

28   ///

11

1  the law by purportedly committing fraud. The Court will therefore grant summary judgment

2  for Apttus on this claim.

3          **C.**     **Breach of Contract (Claim Four)**

4          Baker's breach of contract claim similarly fails. Baker must show four elements to

5  succeed on her claim for breach of contract: (1) Baker and Apttus entered into a valid and

6  existing contract; (2) Baker performed or was excused from performance; (3) Apttus

7  breached; and (4) Baker sustained damages as a result of the breach. *See Saini v. Int'l*

8  *Game Tech.*, 434 F. Supp. 2d 913, 920–21 (D. Nev. 2006) (citation omitted).

9          Baker's breach of contract claim concerns the payment of severance pay. (ECF

10  No. 35 at 33–34.) Baker claims that pursuant to the Agreement, upon termination she was

11  to receive severance of 150,000 share of Apttus stock, 150,000 share options, and three

12  months of pay and benefits if she signed a release of claims (*see* ECF No. 123-1 at 25–

13  26; ECF No. 122-1 at 106–07). (ECF No. 123 at 11.)

14          There is no dispute that Baker did not sign a release of claims. (*See, e.g.*, ECF No.

15  123-1 at 6 ("I refused to sign the separation agreement . . ."); ECF No. 123 at 24; ECF No.

16  134 at 17.) In Baker's view, however, she was never presented with a release of claims to

17  sign because the separation document Apttus provided—titled Separation Agreement and

18  Release of Claims ("Separation and Release") (ECF No. 122-1 at 123–35; ECF No. 123-

19  1 at 64–73)—included release provisions that were not contemplated by the parties at the

20  time they entered the Agreement (ECF No.123-1 at 6 (stating the terms were never agreed

21  to nor bargained for)). (ECF No. 123 at 12, 24.) Baker particularly contends that the

22  Separation and Release went "far beyond what should be included in a standard release."

23  (*Id.* at 24.)

24          Apttus relevantly argues that Baker is not entitled to severance because: (1) she

25  concedes that she never executed or provided any release to Apttus as required by the

26  Agreement; (2) she sued Apttus contrary to an entitlement to severance under the

27  Agreement; (3) there is no particular standard for dictating release; and (4) per the

28  Agreement Baker was not due stock options as part of settlement unless she was

terminated within 12 months of a Change in Control of Apttus, which did not happen. (ECF No. 134 at 17–20; ECF No. 122 at 26–28.)

The Court concludes that per the Agreement's language Baker's severance claim fails because she did not release her claims against Apttus, but has instead sued Apttus. *See, e.g., Southern Trust Mortg. Co. v. K&B Door Co., Inc.*, 763 P.2d 353, 355 (1988) (collecting cases) (providing that when a contract is clear, complete, and unambiguous, the terms of the contract must be construed from the language in the contract). Considering the Agreements language *supra*, it is incongruous for Baker to essentially argue that she is entitled to severance as she sues Apttus. Under the Agreement, severance was clearly contingent on a release of claims Baker may assert against Apttus. This lawsuit is antithetical to any such release, even if Baker had signed a release in the first instance, which she undisputedly did not. To be sure, the Agreement required Baker to sign a release to receive severance by a certain "Release Date"—within 60 days following her termination. (ECF No. 122-7 at 107.)

Baker's claim that she did not sign the Separation and Release because it went beyond the release contemplated by the Agreement does not save her breach of contract claim, even if the Court accepted her contention. This is because assuming Baker is correct that the Separation and Release included release provisions that were not part of the Agreement, there is no indication she raised this issue with Apttus. Therefore, Baker sat on her claim without letting her opposition to the Separation and Release known, failed to execute a release by the 60-day Release Date, and then chose to sue Apttus. Additionally, the Agreement itself permitted Baker to timely execute "a release of claims in a form reasonably satisfactory to the Company." (ECF No. 122-7 at 107.) Therefore, Baker's argument is further undermined to the extent she could have proposed and executed a release other than the Separation and Release that was otherwise satisfactory to Apttus.

For these reasons, the Court finds that Baker's breach of contract claim premised on her contention that she was entitled to severance pay fails based on Baker's failure to

1    comply with the Agreement's release-of-claims requirements. The Court therefore need

2    not address the parties' other agreements regarding the breach of contract claim and will

3    grant summary judgment in Apttus' favor on the claim.

4            **D.      Breach of Duty of Good Faith and Fair Dealing (Claim Five)**

5            Baker's claim for breach of the duty of good faith and fair dealing is premised on

6    her contention that she had an employment contract with Apttus and that Apttus acted "in

7    a manner that was unfaithful to the purpose of the contract" and acted "in bad faith . . . and

8    unfairly." (ECF No. 35 at 34.) Among other things, Apttus argues that Baker's claim fails

9    because Baker was an at-will employee and therefore she cannot assert such a claim.

10   (ECF No. 122 at 28–29.) The Court agrees with Apttus that this claim fails as a matter of

11   law.[9]

12           Under Nevada law, "[e]very contract imposes upon each party a duty of good faith

13   and fair dealing in its performance and execution." *A.C. Shaw Constr. v. Washoe County*,

14   784 P.2d 9, 9 (Nev. 1989) (quoting Restatement (Second) of Contracts § 205). However,

15   in Nevada, an at-will employee cannot ordinarily assert a claim for breach of good faith

16   and fair dealing. *Martin v. Sears, Roebuck & Co.*, 899 P.2d 551, 929 (Nev. 1995); *Bally's

17   Employees' Credit Union v. Wallen*, 779 P.2d 956, 957 (Nev. 1989). Nevada law presumes

18   that employees are at-will and this presumption is overcome by "proving by a

19   preponderance of the evidence that there was an express or implied contract between

20   [her] employer and [her]self that [her] employer would fire [her] only for cause." *Am. Bank

21   Stationery v. Farmer*, 799 P.2d 1100, 1101–02 (1990). An employee's "subjective

22   expectations of long term employment" "are insufficient to substantiate an express or

23   implied agreement for continuing employment." *Martin*, 899 P.2d at 929.

24           In her response to Apttus' Motion, Baker argues that the caselaw concerning at-will

25   employees is inapplicable to her claim because her claim is not grounded on her discharge

26   ///

_____

27           [9]Baker's argument appears to shift the character of her breach from the contractual
     breach alleged in the FAC (ECF No. 35 at 34–35) to claiming tortious breach (*see* ECF
28   No. 123 at 25–26). Of course, the Court considers Baker's claim as alleged in the FAC—
     not based on her argument offered in opposing summary judgment.

1   from employment. (ECF No. 123 at 26.)  Rather, Baker argues, the claim rests on her

2   contention that the action of Apttus executives prevented her from performing her job to

3   reach targeted sale goals and ultimately curtailed her ability to obtain the benefits of the

4   Agreement—such as performance stock options. (*Id.*)

5        The Court is unpersuaded by Baker's argument. Baker's argument is essentially

6   that the conditions of her employment—as opposed to her employment itself—were

7   presented in bad faith. The Court agrees, as Apttus argues (ECF No. 134 at 20), that the

8   distinction Baker seeks to make amounts to a distinction without a difference. Baker's

9   contention does not change the legal reality that Apttus hired her as an at-will employee.

10  (ECF No. 122-1 at 108.) The Agreement expressly provided that Baker could be

11  terminated with or without cause, at any time, for any reason, and without notice. (*Id.*)

12  Therefore, the Agreement unambiguously negated any type of promise as to the length of

13  Baker's employment relationship. Accordingly, this claim fails and the Court will grant

14  summary judgment in favor of Apttus.

15            **E.      Fraud/Misrepresentation (Claim One)**

16       Baker asserts a fraud in the inducement claim, chiefly based on representations

17  she alleges Krappe made to her in the process of recruiting her to join Apttus. (ECF No.

18  35 at 20–30.) Before proceeding, the Court notes that, there is no dispute that Krappe was

19  acting on behalf of Apttus at the time he made the purported misrepresentations or

20  fraudulent assertions.

21       Under Nevada law, a claim for fraud in the inducement is established where Baker

22  proves, by clear and convincing evidence,[10] the following: (1) a false representation made

23  by Krappe; (2) Krappe's knowledge or belief that the representation was false (or

24  knowledge that he had an insufficient basis for making the representation); (3) Krappe's

25  ///

26

27       [10]*See also Heyman v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, No. 2:15-CV-1228-APG-GWF, 2019 WL 1177960, at *8 (D. Nev. Mar. 12, 2019) (collecting cases) (explaining that a plaintiff must show by clear and convincing evidence

28  that the defendant falsely represented a material fact).

1   intention to induce Baker to consent to the formation of the Agreement; (4) Baker's

2   justifiable reliance upon the misrepresentation; and (5) damage to Baker resulting from

3   her reliance.[11] *See J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009,

4   1017 (Nev. 2004).

5       In the FAC, Baker specifically alleges that during the process of recruiting her,

6   Krappe misrepresented that: (1) Apttus had $400 million in its pipeline (ECF No. 35 at 22);

7   (2) Apttus had customers, including Clorox, McKesson, GE, and Intel embracing Apttus

8   and its products (*id.* at 21–22); (3) the extent of the development and availability of Apttus

9   products (*id.* at 22–24); (4) Apttus had all of the funding it needed (*id.* at 24–25); (5) the

10  nature and extent of employee opportunities and business development activity meant

11  that each of Baker's sales managers, who were part of an envisioned "deal team"

12  approved by Apttus' board, would have 10 accounts and the "deal team" would be able to

13  pick any accounts from any territory (*id.* at 25–28); (6) that Baker would report directly to

14  Krappe; (7) that Baker's sales team would be separate and distinct from the sales

15  organization managed by Kamal; and (8) Krappe assured Baker that he would manage

16  any negative or internal political issues that may arise because of Baker's position or role

17  in Apttus (*id.* at 28).

18      Apttus counters, arguing that: (1) Baker waived her fraud claim by accepting the

19  Agreement; (2) the claim is not actionable as a matter of law because Krappe's alleged

20  representations amounts to puffery or constitutes statements of opinion—not actual

21  representations; (3) there is no evidence that the purported representations were untrue;

22  (4) the claim fails because Baker has no evidence to prove fraudulent intent (or that

23  Krappe knew his representations were false at the time he made them); and (5) Baker's

24  conduct in working at Apttus evidences the falsity of her claims.  (ECF No.122 at 11–23;

25  ECF No. 134 at 8–13.) Apttus also contends that Baker's communications, conduct, and

26  ///

27  ///

28      [11]Neither party discusses or disputes damages in their respective motions. (*See, e.g.*, ECF No. 123 at 14 n.4 (acknowledging this).)

1  testimony show that she did not accept employment with Apttus in reliance on the alleged

2  misrepresentations. (*Id.* at 22–23.)

3        Apttus' fourth contention misstates the legal requirement here. As noted above,

4  Baker need only show Krappe's knowledge or belief that the representation was false (or

5  knowledge that he had an insufficient basis for making the representation). *J.A. Jones*

6  *Constr. Co.*, 89 P.3d at 1017. Further, the Court agrees with Baker that Apttus' fifth

7  contention—which focuses on Baker's conduct after she began working at Apttus—is

8  irrelevant to the Court's inquiry (*see* ECF No. 123 at 20–21). Additionally, Apttus' argument

9  that Baker did not justifiably rely on the alleged representations materially reiterates its

10  fifth contention and does not actually cite to any particular testimony or communication

11  that support a conclusion that Baker did not justifiably rely. (*See id.* at 11–12, 22–23.) The

12  argument is therefore unsupported.

13            **1.    Apttus' Waiver Argument**

14        In examining the substance of Baker's allegations of fraud/misrepresentation, the

15  Court disagrees with Apttus that Baker waived all her claims simply by accepting the

16  Agreement based on the Agreement's integration clause. (*See* ECF No. 122 at 13–14.)

17  The Agreement relevantly provides that it "supersede[s] any prior representations or

18  agreements including, but not limited to, interview or pre-employment negotiations,

19  whether written or oral." (ECF No. 122-1 at 108.)

20        As Baker points out (ECF No. 123 at 15), Apttus' contention is not consistent with

21  Nevada law. *See, e.g.*, *Blanchard v. Blanchard*, 839 P.2d 1320, 1322–23 (Nev.

22  1992) ("Integration clauses do not bar claims for misrepresentation. Likewise, waiver

23  clauses cannot bar a misrepresentation claim.") (internal citation omitted). Even if the

24  contention was consistent with Nevada law, the noted integration clause's language does

25  not obviously extend to the alleged misrepresentations because the subject of such

26  representations is not necessarily captured by the limits of the language in the Agreement.

27        The Court now turns to Baker's specific claims of misrepresentation.

28  ///

2.   **Ten Accounts Per Team Member; Report Directly to Krappe; Separate and Distinct from Kamal's Management; Krappe Would Manage Internal Politics (Claims of Misrepresentation 5, 6, 7, and 8)**

"The mere failure to fulfill a promise or perform in the future . . . will not give rise to a fraud claim absent evidence that the promisor had no intention to perform at the time the promise was made." *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992). The Court finds that Baker's fifth, sixth, seventh, and eighth claims of misrepresentation are not actionable. These claims of misrepresentation amount to promises of future performance which Baker has produced no clear and convincing evidence to show were made without intention of actual performance. At best, Baker argues that Krappe's failure to keep his promises or to resolve issues that arose after she started with Apttus demonstrates that he never intended to follow through on his promises. (*E.g.*, ECF No. 123 at 20.) The Court disagrees that this is sufficient to withstand summary judgment.[12]

3.   **Particular Customers that Were Purportedly Happy or Embracing Apttus' Products (Claim of Misrepresentation 2)**

Baker's claim that Krappe misrepresented that Apttus had customers, such as Clorox, McKesson, GE, and Intel, that were embracing Apttus and its products and were "happy" (*e.g.*, ECF No. 35 at 21–22; ECF No. 123 at 13–14) is also not actionable.

Estimates and opinions based on past experience are not actionable in fraud. *Bulbman*, 825 P.2d at 592 (citing *Clark Sanitation v. Sun Valley Disposal,* 87 Nev. 338, 487 P.2d 337 (1971)). As a general matter statements that amount to "puffing" or "puffery" are also not actionable. *See, e.g., id.* (citation omitted). "The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual

///

///

---

[12]Some of these representations, such as that Baker would report directly to Krappe, additionally fail per the Agreement's express language that "Apttus may change your job duties, title, compensation and benefits, as well as Apttus' personnel policies and procedures, from time to time." (ECF No. 122-1 at 107.)

1   assertions." *Haskell v. Time, Inc.,* 857 F. Supp. 1392, 1399 (E.D.Cal.1994) (citation

2   omitted).

3       The Court agrees with Apttus that the alleged representations about customers

4   embracing Apttus' products and/or that customers were happy with the same amounts to

5   puffery or opinion. Accordingly, they cannot support a contention of misrepresentation.

6           **4.    Pipeline/Funding and Development and Availability of Apttus'**
             **Products (Claims of Misrepresentation 1, 3, and 4)**
7

8       The Court finds that a conclusion as to whether Baker's first, third, and fourth

9   claims—that Apttus had $400 million in its pipeline,[13] the extent of the development and

10  availability of Apttus' products (specifically regarding readiness, implementation and

11  availability), and that Apttus had all the funding it needed—amount to opinions or puffery

12  is not as clear.  While mere opinions are not actionable as fraud, "[t]he question whether

13  a statement was intended to be given as an opinion, and was so received, is, however,

14  one for a jury to determine, upon the peculiar circumstances of the case." *Banta v. Savage*,

15  12 Nev. 151, 157 (1877).[14]  Accordingly, the Court concludes that it is most appropriate to

16  have a jury decide whether, as an initial matter, Baker's first, third, and fourth contentions

17  of misrepresentation were intended as opinions and/or puffery and was received by Baker

18  as such. That preliminary inquiry is necessary to determine if the representations are

19  actionable in the first instance. The application of the underlying elements of Baker's

20  fraud/misrepresentation claim as to these representations may then be addressed.

21  Baker's claim for fraud/misrepresentation therefore survives summary judgment on these

22  grounds.

23  ///

24  ///

25  ///

26      [13]This statement seems a rather straightforward factual statement, and not an
    opinion or puffery.

27

28      [14](*See, e.g.*, ECF No. 123 at 18 (contending that Krappe made the representations
    regarding    pipeline/finding    as    facts    to    entice    Baker).)

## VI.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Baker's motion for leave to file a surreply (ECF No. 136) is granted *nunc pro tunc* as unopposed under Local Rule 7-2.

It is further ordered that Baker's motion for summary judgment (ECF No. 121) is granted.

It is further ordered that Apttus' motion for summary judgment (ECF No. 122) is granted in part and denied in part. It is granted as to all except Baker's fraud/misrepresentation claim (claim one), as discussed herein.

DATED THIS 26th day of May 2020.

_____

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE